# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-0419V
UNPUBLISHED

| | |
|---|---|
| ANDREA TJADEN,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: January 25, 2021<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Paul R. Brazil*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Mallori Browne Openchowski*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On March 20, 2019, Andrea Tjaden filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, after receiving the influenza ("flu") vaccine on October 10, 2016. Petition at 1, ¶¶ 2, 13. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount **$68,320.00, representing $68,000.00 for her past pain and suffering and $320.00 for her unreimbursed out-of-pocket expenses.**

---

[1] Because this Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**I.      Relevant Procedural History**

Along with the Petition, Ms. Tjaden filed her affidavit and the medical records required by the Vaccine Act. Exhibits 1-9, ECF No. 1; *see* Section 11(c). She also sought subpoena authority to obtain any additional documentation regarding her vaccination, which I granted. ECF Nos. 6-7. Petitioner filed the obtained medical record on April 29, 2019. Exhibit 10, ECF No. 9.

Almost a year later, on April 21, 2020, Respondent filed a status report indicating that he wished to file a Rule 4 Report but was also willing to consider Petitioner's demand. ECF No. 23. Respondent filed his Rule 4 Report on June 5, 2020, and I issued a Ruling on Entitlement that same day. ECF Nos. 26, 28. After attempting thereafter for four months to informally resolve the issue of damages, the parties filed a joint status report indicating they had reached an impasse. ECF No. 34.

On December 4, 2020, the parties filed their simultaneous briefs. Respondent's Brief on Damages ("Res. Brief"), ECF No. 35; Petitioner's Memorandum in Support of Damages ("Pet. Brief"), ECF 36. They were allowed two weeks thereafter to file any reply, but neither party chose to do so.

The issue is now ripe for adjudication.

**II.     Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and

suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[3] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

### III. Prior SIRVA Compensation Within SPU[4]

#### A. Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2021, 1,874 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 1,820 of these cases, with the remaining 54 cases dismissed.

Of the compensated cases, 1,058 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 47 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial

---

[3] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[4] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[5]

1,011 of this subset of post-entitlement determination, compensation-awarding cases were the product of informal settlement - 987 cases via proffer and 24 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or in sight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Human Servs.,* No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (emphasis in original).

The remaining 762 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered[6] Damages** | **Stipulated Damages** | **Stipulated[7] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *47* | *987* | *24* | *762* |
| **Lowest** | $55,619.60 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $75,044.44 | $74,040.17 | $90,000.00 | $47,500.00 |
| **Median** | **$86,784.56** | **$93,975.95** | **$115,214.49** | **$65,000.00** |

---

[5] *See, e.g., Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[6] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

[7] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

| 3rd Quartile | $125,000.00 | $120,390.74 | $153,788.29 | $91,250.53 |
| Largest | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $509,552.31 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 47 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $55,000.00 to $185,000.00, with $85,000.00 the median amount. Only four of these cases involved an award for future pain and suffering, with yearly awards range from $500.00 to $1,000.00.[8]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment of 40 days to over six months. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. These SIRVAs usually resolved after one to two cortisone injections and two months or less of PT. None required surgery. The duration of the injury ranged from six to 29 months, with petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 50 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In three cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering. In the fourth case involving an award of future pain and suffering, the petitioner provided evidence of an ongoing SIRVA expected to resolve within the subsequent year.

---

[8] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

## IV.  Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

### A.  The Parties' Arguments

The parties agreed Petitioner should be awarded $320.00 for her unreimbursed out-of-pocket expenses. Pet. Brief at 1 n.1; Res. Brief at 9. Thus, the only area of disagreement is regarding the amount of compensation which should be awarded for Petitioner's past pain and suffering.

Petitioner requested $85,000.00 for this damages component. Pet. Brief at 1. Citing five reasoned decisions in other SPU SIRVA cases, Petitioner asserted that the severity and duration of her symptoms were most like those suffered in cases featuring awards of $75,000.00,[9] and were more significant than petitioners who received lesser awards ($55,000.00 to $60,000.00).[10] While making these comparisons, Petitioner emphasized the four-day period between vaccination and the date she first sought treatment of her SIRVA, as well as the higher pain levels she reported two weeks and one month after vaccination. She also alleged that she suffered the symptoms of her SIRVA for 15 months.

In reaction, Respondent maintained Petitioner should be awarded only $57,500.00 for her past pain and suffering. Res. Brief at 1. Emphasizing the short duration of Petitioner's PT, Respondent favorably compared Petitioner's SIRVA to injuries suffered by three petitioners who received awards ranging from $55,000.00 to $65,000.00, based

---

[9] *Bordelon v. Sec'y of Health & Human Servs.*, No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019); *Kim v. Sec'y of Health & Human Servs.*, No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018); *Marino v. Sec'y of Health & Human Servs.,* No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018).

[10] *Rayborn v. Sec'y of Health & Human Servs.,* No. 18-0226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020) (awarding $55,000.00 for actual pain and suffering); *Knauss v. Sec'y of Health & Human Servs.,* No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for actual pain and suffering).

6

on the two cases with lower awards cited by Petitioner plus one additional case.[11] Res. Brief at 7-8. When performing this comparison, Respondent maintained that the chiropractic care Petitioner underwent "*primarily* addressed [her] lumber and cervical pain," and thus reflected harm distinguishable from the pain associated with the shoulder injury. *Id.* at 7 (emphasis in original). Respondent also criticized the "meeting-in-the-middle" method that he believes is being utilized by the special masters to split the difference between each side's pain and suffering figure, arguing that the large number of proffered cases in SPU is a more accurate representation of the appropriate of damages to be awarded, and proposing that awards outside the Vaccine Program should be considered since he believes Program awards are unreasonably inflated. *Id.* at 4-7.

### B.     Analysis

I have previously addressed the more general arguments about calculation of pain and suffering damages made by Respondent during expedited motions days and in other damages decisions. While noting that this end result may occur in some cases (and disappoint both sides as a result), I have in fact rejected the "meeting-in-the-middle" method Respondent claims is being used, based on the proposition that "each petitioner deserves an examination of the specific facts and circumstances in her or his case." *Sakovits*, 2020 WL 3729420, at *3. I also have rejected Respondent's argument that the amounts awarded in proffered cases are a more accurate gauge of the appropriate amount to be awarded than reasoned decisions from the court and special masters. *Id.* at *4. While "settled cases and proffers provide *some* evidence of the kinds of awards received overall in comparable cases," they are not as persuasive as reasoned decisions from a judicial neutral. *Id.* (emphasis in original). Taken as a whole, however, the data from these decisions can be a helpful gauge of the compensation being awarded in SPU SIRVA cases.

I also have not previously given great weight to Respondent's citation to pain and suffering determinations from traditional tort system state court cases, noting that Congress intended the "no-fault" system established in the Vaccine Program to be generous. H.R. REP. NO. 99-908, at 12-13 *reprinted in* 1986 U.S.C.C.A.N. 6344, 6353-54. Thus, Vaccine Program compensation will likely be greater than what is awarded in civil actions. Additionally, the descriptions of the traditional tort system cases proposed by Respondent often lack basic information needed for comparison. *Rafferty v. Sec'y of Health & Human Servs.*, No. 17-1906V, 2020 WL 3495956, at *18 (Fed. Cl. Spec. Mstr. May 21, 2020). As a result, "SIRVA awards in the Vaccine Program are self-evidently more relevant and apposite." *Id.*

---

[11] *Dagen v. Sec'y of Health & Human Servs.*, No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019) (awarding $65,000.00 for actual pain and suffering).

A thorough review of the medical records filed in this case reveals several weaknesses in the arguments advanced by both parties. When comparing the facts and circumstances in Petitioner's case to those of the petitioners in *Rayborn, Dagen,* and *Knauss,* Respondent neglected to recognize or mention that the initial pain and limited ROM experienced by Petitioner was more substantial than that experienced by any of these petitioners. Likewise, Petitioner failed to mention the unrelated difficulties she experienced during 2017, such as her cervical and thoracic pain and swelling in her right forearm, which constitute other sources of pain and suffering during this time distinguishable from SIRVA-related sequelae.

The medical records show that Petitioner sought treatment for her right shoulder pain four days after vaccination. Exhibit 2 at 18-19. At this visit to her primary care provider ("PCP"), Petitioner assessed her pain at a level of two out of ten. Although she reported that her ROM was improving, she indicated she was unable to raise her arm. *Id.* Petitioner's PCP instructed her to rest and ice her arm and to take Ibuprofen. He indicated she should begin PT if the shoulder injury had not improved within two weeks. *Id.* at 19.

When Petitioner returned to her PCP on October 29, 2016, she reported that both her pain and limited ROM had increased. Exhibit 2 at 16. She estimated her level of pain was eight out of ten and reported that she was unable to raise her arm higher than 90 degrees. *Id.* at 16-17. Her PCP diagnosed Petitioner with adhesive capsulitis. *Id.* at 17. Petitioner reported this same substantial level of pain on the PT intake form she completed on November 7, 2016, indicating pain at a minimum of two to three to a maximum of seven to eight. Exhibit 3 at 28. Three days later, she again assessed her pain as four at rest and eight with movement. *Id.* at 22.

A month later, on November 30, 2016, Petitioner's pain had decreased to two out of ten. Exhibit 3 at 74. By December 9, 2016, Petitioner reported zero pain at rest and a maximum level of two. *Id.* at 85. When discharge from PT on January 23, 2017, she was still experiencing mild pain and limitations in her ROM. Petitioner, an occupational therapist herself, was instructed to continue a home exercise program ("HEP"). *Id.* at 16.

Although there is evidence that Petitioner continued to experience symptoms of her SIRVA throughout 2017, she never reported the more significant levels of pain that she experienced in late October and November 2016. *E.g.,* Exhibit 4 at 18 (discussing her right shoulder pain when evaluated for vascular thoracic outlet syndrome, indicating "she does not have significant pain on a daily basis"). Additionally, she did not seek treatment for her SIRVA again until October 2017. Although her right shoulder pain, described as a level of three out of ten, was included in the list of symptoms during chiropractic treatment Petitioner received from May through October 2017, these records clearly stated that Petitioner's "primary complaints [we]re lumbar and cervical pain/tension." Exhibit 5 at 20.

8

When she sought treatment again from an orthopedist on October 30, 2017, Petitioner described her pain as a dull and aching, at a level of three out of ten, but reported that she had full ROM. Exhibit 4 at 2. She was diagnosed with bursitis and instructed to continue her HEP. *Id.* at 3. She repeated this description when seen on December 11, 2017 (*id.* at 35-36), but her pain had decreased to one out of ten by her next and last visit on January 22, 2018 (*id.* at 40).

As described in the medical records, Petitioner's SIRVA symptoms of pain and reduced ROM were severe for the first two months of her injury. Thereafter, her condition can be described as mild to moderate. There is evidence that her ROM was no longer limited, and that her pain was intermittent and at a maximum level of three. By 15 months after vaccination, Petitioner's SIRVA was close to being resolved.

I find that the symptoms experienced by Petitioner most closely resembled those of the petitioner in *Kuhn,* who was awarded $67,500.00 for past pain and suffering. *Kuhn v. Sec'y of Health & Human Servs.*, No. 18-0091V, 2020 WL 3750994, at *3 (Fed. Cl. Spec. Mstr. June 5, 2020). Both petitioners experienced severe pain initially which decreased substantially within two to three months. *Kuhn*, 2020 WL 3750994, at *2. Like the Petitioner in this case, the *Kuhn* petitioner sought treatment within days of vaccination. Although Petitioner required approximately twice the amount and duration of PT, the *Kuhn* petitioner received some relief from a cortisone injection. *Id.* Given that Petitioner ROM was more severely limited, even though only for a short time, I will award the Petitioner in this case slightly more than the *Kuhn* petitioner.

## V.     Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $68,000.00 represents a fair and appropriate amount of compensation for Petitioner's past pain and suffering. I also find that Petitioner is entitled to $320.00 for her past expenses.**

**I thus award Petitioner a lump sum payment of $68,320.00, representing $68,000.00 for her actual pain and suffering and $320.00 for her actual unreimbursable expenses in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

9

The Clerk of the Court is directed to enter judgment in accordance with this decision.[12]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.